1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                     June 2014 Grand Jury

11  UNITED STATES OF AMERICA,          SA CR No. 14-131(A)

12            Plaintiff,               F̲ I̲ R̲ S̲ T̲
                                       S̲ U̲ P̲ E̲ R̲ S̲ E̲ D̲ I̲ N̲ G̲
13            v.                       I̲ N̲ D̲ I̲ C̲ T̲ M̲ E̲ N̲ T̲

14  SU BIN,                            [18 U.S.C. §§ 1030(a)(2)(C),
       aka "Stephen Su,"              (c)(2)(B)(i)-(iii), §§ 1030(a)(4),
15     aka "Stephen Subin,"           (c)(3)(A), §§ 1030(b),
       aka "Steven Subin,"            (c)(2)(B)(i)-(iii), (c)(3)(A):
16                                     Unauthorized Computer Access; 18
            Defendant.                 U.S.C. § 371: Conspiracy; 22
17                                     U.S.C. §§ 2778(b)(2), (c), 22
                                       C.F.R. §§ 121.1, 123.1,
18                                     127.1(a)(1), 127.1(a)(3),
                                       127.1(a)(4), 127.1(d), 127.1(e):
19                                     Arms Export Control Act; 18 U.S.C.
                                       § 1832(a)(5): Conspiracy to Commit
20                                     Theft of Trade Secrets; 18 U.S.C.
                                       § 2(a): Aiding and Abetting]
21
22

23        The Grand Jury charges:

24                    INTRODUCTORY ALLEGATIONS

25        At all times relevant to this Indictment:

26        1.    Defendant SU BIN, also known as ("aka") "Stephen Su," aka

27  "Stephen Subin," aka "Steven Subin" ("defendant SU"), was a citizen

28  of the People's Republic of China (hereinafter "China").

1      2.   Unindicted Co-conspirator 1 was a citizen of China and

2  resided in China.

3      3.   Unindicted Co-conspirator 2 was a citizen of China and

4  resided in China.

5      4.   Defendant SU, Unindicted Co-conspirator 1, and Unindicted

6  Co-conspirator 2 e-mailed each other both in Chinese and English.

7      5.   Between in or about October 2008 and in or about May 2014,

8  defendant SU traveled to the United States multiple times, including

9  specifically:

10         a.   between on or about January 13, 2010, and on or about

11  January 24, 2010;

12         b.   between on or about February 11, 2010, and on or about

13  February 21, 2010;

14         c.   between on or about May 26, 2010, and on or about June

15  8, 2010;

16         d.   between on or about June 20, 2010, and on or about

17  June 27, 2010;

18         e.   between on or about September 8, 2010, and on or about

19  September 11, 2010;

20         f.   between on or about December 18, 2010, and on or about

21  December 28, 2010;

22         g.   between on or about June 30, 2011, and on or about

23  June 22, 2011;

24         h.   between on or about September 28, 2012, and on or

25  about October 3, 2012;

26         i.   between in or about October 2012 and on or about

27  November 3, 2012; and,

28

       j.   between on or about December 31, 2012, and on or about January 2, 2013.

6.   The Boeing Company (hereinafter "Boeing"), headquartered in Chicago, Illinois, was a company with offices throughout the United States that developed and sold military and commercial aircraft, among other goods; technologies; and related support services. Boeing had facilities in many locations, including Seal Beach and Long Beach, California.  The goods and technologies Boeing sold to its customers were sold and shipped, and were intended to be sold and shipped, in interstate and foreign commerce.

7.   One of the aircraft models that Boeing manufactured was the C-17 military transport aircraft ("the C-17"), including variants of the C-17, which was manufactured in Los Angeles County, California, located in the Central District of California.  The C-17 was developed over multiple years and produced by Boeing and its predecessor and subcontractors pursuant to contracts with the United States Air Force at a cost of billions of dollars.  Developing and producing the C-17 required the use of trade secrets and the use of export-controlled technical data.  Boeing maintained multiple computer servers containing files relating to the C-17, including servers in Orange County, California, containing detailed files necessary to make the component parts of the C-17.

8.   The F-35 "Lightning" was a fifth-generation fighter jet aircraft capable of supersonic speed and equipped with "stealth" capabilities that allowed it to evade radar ("the F-35").  The F-35 was developed over multiple years by multiple companies performing contracts with the United States Department of Defense ("defense contractors") in the United States and other countries at a cost of

1  billions of dollars.  Developing and producing the F-35 required the
2  use of those defense contractors' trade secrets and the use of
3  export-controlled technical data.  Variants of the aircraft were made
4  for different services of different countries' armed forces.

5       9.   The F-22 "Raptor" was a fifth-generation fighter jet
6  aircraft capable of supersonic speed and equipped with "stealth"
7  capabilities that allowed it to evade radar ("the F-22").  The F-22
8  was developed over multiple years by defense contractors in the
9  United States at a cost of billions of dollars.  Developing and
10 producing the F-22 required the use of those defense contractors'
11 trade secrets and the use of export-controlled technical data.

12      10.  In developing, testing, producing, and maintaining the C-
13 17, F-35, F-22, and other military technology, defense contractors
14 generated documents, files, and information, including computer
15 files, that contained trade secrets that were the product of research
16 and development and that were proprietary information belonging to
17 those defense contractors.  Those trade secrets related to various
18 facets of the aircraft, its development, design, testing, production,
19 components, and ongoing maintenance.  Those trade secrets also
20 related to the ways in which those defense contractors competed to
21 win government contracts to build and service military aircraft and
22 other military technology.  Those trade secrets existed in a single
23 document and record at times, and at other times as compilations and
24 collections of documents and files that related to the entire
25 aircraft and to portions or components of the aircraft.

26      11.  The Arms Export Control Act, Title 22, United States Code,
27 Section 2778 ("AECA"), authorized the President of the United States
28 to control the export of "defense articles" and "technical data"

4

1    related to such defense articles by designating those items and that

2    data as defense articles and by promulgating regulations for the

3    import and export of such articles and data.

4         12.   Defense articles and technical data subject to such

5    licensing requirements were designated on the United States Munitions

6    List ("USML").  Those designations were made by the United States

7    Department of State ("Department of State") with the concurrence of

8    the United States Department of Defense ("Department of Defense").

9    (22 U.S.C. § 2778(a)(1); 22 C.F.R. § 120.2.)

10        13.   Category VIII of the USML, among others, included aircraft

11   and aircraft-related equipment.  (22 C.F.R. § 121.1.)

12        14.   The AECA and its attendant regulations, the International

13   Traffic in Arms Regulations, Title 22, Code of Federal Regulations,

14   Parts 120-130 ("ITAR"), required a person to apply for and obtain an

15   export license from the Directorate of Defense Trade Controls

16   ("DDTC") of the Department of State before exporting from the United

17   States defense articles or related technical data by any means,

18   including by disclosing technical data on the USML to a foreign

19   person.   (22 U.S.C. § 2778(b)(2); 22 C.F.R. §§ 120.1, 120.10,

20   120.17.)

21        15.   At no time did defendant SU apply for, receive, or possess

22   a license to export defense articles or technical data from the

23   United States.

24        16.   One of the files stored on Boeing's computer servers was a

25   file titled "1c-17a-1-2.pdf," which was a Supplemental Flight Manual

26   titled "MISSION COMPUTER" that related to the C-17.  The 1c-17a-1-2

27   Supplemental Flight Manual contained military technical data related

28   to the C-17, was designated on the USML in category VIII(i) of the

1  USML, required a license to be exported from the United States to any
2  other country, and contained a legal warning at the beginning of the
3  document that its export was restricted.

4      17.  The factual allegations in paragraphs 1 through 16 are
5  incorporated in all counts of this Indictment by reference and are
6  re-alleged as though fully set forth therein.

7      18.  In the course of their conduct, defendant SU, Unindicted
8  Co-conspirator 1, and Unindicted Co-conspirator 2 committed the
9  following acts on or about the following dates:

10     19.  On October 23, 2008, Unindicted Co-conspirator 1 wrote an
11 e-mail to another person asking:  "Hey there, Do you sell the
12 Poisonivy Program?  How much do you sell it for? i wish to buy one
13 which can not be detect [sic] and killed by the Anti-Virus software."

14     20.  On July 22, 2009, defendant SU forwarded an e-mail that he
15 had received from Unindicted Co-conspirator 1.  Attached to that
16 e-mail was a draft contract for the purchase of a "System for
17 Unidirectional Secure Delivery of Files Over the Internet," from an
18 identified company located in China that advertised its expertise in
19 the fields of computer network attack and defense and communication
20 security.

21     21.  On July 23, 2009, defendant SU caused one of his company's
22 employees to e-mail defendant SU and Unindicted Co-conspirator 1 a
23 signed version of the contract described in paragraph 20 that
24 defendant SU had executed on behalf of his company.

25     22.  On December 14, 2009, defendant SU sent an e-mail to
26 Unindicted Co-conspirator 1 with a subject line of "Target."
27 Attached to the e-mail was a file containing the names and positions
28 of U.S. executives as well as a website and telephone number.

23.   On December 17, 2009, defendant SU sent an e-mail to Unindicted Co-conspirator 1 and copied Unindicted Co-conspirator 2 with a subject line of "RE: Target."  In that e-mail defendant SU identified e-mail addresses, a website, and four individuals associated with a European company.

24.   On January 13, 2010, Unindicted Co-conspirator 1 sent defendant SU an e-mail with a subject line of "C-17," attached a file titled "Desktop 22.rar," and wrote that he would send defendant SU the password for the file.

25.   On January 14, 2010, defendant SU sent an e-mail to Unindicted Co-conspirator 1 with a subject line of "RE: C-17," attached a file titled "Desktop 22.rar," and asked Unindicted Co-conspirator 1 to give defendant SU the password for the file.

26.   On January 21, 2010, Unindicted Co-conspirator 1 sent defendant SU a file titled "C-17_2.rar" and asked defendant SU to write Unindicted Co-conspirator 1 a document about which files were important, which ones were not important, and what they were.

27.   On January 22, 2010, Unindicted Co-conspirator 1 sent an e-mail to defendant SU with a subject line of "Re: C-17 _2," and wrote that 3.txt was the subdirectory and document of 3-jianua.txt, added that some directory trees contained random codes, and reminded defendant SU to read 3.txt.

28.   On January 23, 2010, defendant SU sent an e-mail to Unindicted Co-conspirator 1 with a subject line of "RE: C-17 _2," attached a document titled "Appendix 3.rar," and wrote that, judging from its name, the document looked fine.

29.   On January 23, 2010, Unindicted Co-conspirator 1 sent an e-mail to defendant SU with a subject line of "Re: C-17 _2," and wrote

1  that 3.txt was the list of documents, added that defendant SU should

2  pay attention to it, and noted that there was some gibberish due to

3  incorrect encoding.

4      30.  On January 25, 2010, defendant SU sent an e-mail to

5  Unindicted Co-conspirator 1 with a subject line of "Re: C-17 _2" and

6  attached a document titled "Appendix-3.docx," which was a list

7  approximately 1,467 pages long of files and folders related to the C-

8  17, with some files and folders highlighted in yellow.  In the e-mail

9  defendant SU wrote that the useful ones were marked in yellow and

10  that they should be the computer documents of a person who used an

11  airplane as opposed to a designer.

12      31.  On February 2, 2010, defendant SU sent an e-mail to

13  Unindicted Co-conspirator 1 with a subject line of "Document No. 17,"

14  and defendant SU attached to this e-mail a compressed file, the

15  contents of which included a file with the characters "C-17" in the

16  filename.

17      32.  On February 4, 2010, defendant SU sent Unindicted Co-

18  conspirator 1 an e-mail attaching a file titled "System

19  20100206.rar."  Compressed within the .rar file was a file with the

20  characters "C-17" in the filename.

21      33.  On February 7, 2010, defendant SU sent Unindicted Co-

22  conspirator 1 an e-mail attaching a file titled "20100207.rar."

23  Compressed within the .rar file was a document with the characters

24  "C-17" in the filename.

25      34.  On February 28, 2010, defendant SU sent Unindicted Co-

26  conspirator 1 an e-mail in which defendant SU wrote that the value

27  was decent for a document related to a specific military aircraft,

28

1  and that it was information needed by an identified state-owned

2  aircraft company in China, but that the company was too stingy.

3      35.  On March 1, 2010, Unindicted Co-conspirator 1 sent

4  defendant SU an e-mail and wrote only "17 keywords" in the body of

5  the e-mail.

6      36.  On March 1, 2010, Unindicted Co-conspirator 1 sent

7  defendant SU an e-mail and wrote "17's LIST. Read Carefully."

8  Unindicted Co-conspirator 1 attached a file to that e-mail titled

9  "17.rar."

10     37.  On March 3, 2010, defendant SU sent Unindicted Co-

11  conspirator 1 an e-mail and attached a file titled "17.rar."

12  Compressed within the .rar file were 11 .txt files, whose file names

13  were 17/1.txt through 17/10.txt and an additional file titled

14  17/tools.txt.

15     38.  On March 4, 2010, defendant SU sent Unindicted Co-

16  conspirator 1 an e-mail attaching a file titled "blueprint.rar."

17     39.  On March 7, 2010, Unindicted Co-conspirator 1 sent an e-

18  mail to another co-conspirator attaching several reports about the

19  expenses and activities of certain Chinese entities.  One report

20  described how one of the entities identified targets and sought

21  foreign technologies to advance research and development cost-

22  effectively.

23     40.  On March 19, 2010, Unindicted Co-conspirator 1 sent

24  defendant SU an e-mail with a subject line of "View picture" and

25  wrote in the body of the e-mail "Haha."  Unindicted Co-conspirator 1

26  attached to that e-mail an image of a list of seven filenames that

27  had English characters followed by Chinese characters describing

28

their contents, six of which files contained "c-17" or "c17" in the name of the file.

41.   On April 4, 2010, Unindicted Co-conspirator 1 sent defendant SU an e-mail with a subject line of "22" and wrote "22" in the body of the e-mail.  Attached to the e-mail was a document titled "22.rar."

42.   On April 4, 2010, defendant SU sent Unindicted Co-conspirator 1 an e-mail with a subject line of "RE: 22."

43.   On April 4, 2010, defendant SU sent Unindicted Co-conspirator 1 an e-mail with a subject line of "RE: 22" and instructed Unindicted Co-conspirator 1 to take a look at the file "avel\Training\AVEL Familiarization Course 7-28-08 .ppt."

44.   On April 4, 2010, Unindicted Co-conspirator 1 sent defendant SU an e-mail with a subject line of "Re: Reply: 22" and attached an image file named "IMG_0367.JPG."  That image showed a computer monitor displaying a presentation related to training on an F-22 component used in launching missiles, which was marked proprietary and with the warning, "Proprietary Information Source Selection Sensitive.  This Data is Covered by IATR [sic] 22 CFR 120-130."

45.   On April 4, 2010, Unindicted Co-conspirator 1 sent defendant SU an e-mail and asked defendant SU about providing a sample of the data they had acquired relating to the C-17.

46.   On April 5, 2010, defendant SU sent Unindicted Co-conspirator 1 an e-mail concerning the sale of data and expenses.

47.   On April 5, 2010, Unindicted Co-conspirator 1 sent defendant SU an e-mail and wrote that the sample of C-17 data was not intended for sale, but rather for use as a bargaining chip.

48.   On August 27, 2010, defendant SU sent Unindicted Co-conspirator 1 an e-mail attaching a .rar file.

49.   On October 24, 2010, defendant SU sent Unindicted Co-conspirator 1 an e-mail.  Attached to that e-mail was a .rar file, and compressed within the .rar were five documents containing filenames that corresponded to military and civilian aircraft.  These documents listed some files and folders that were highlighted in yellow.

50.   On December 27, 2010, Unindicted Co-conspirator 1 e-mailed to Unindicted Co-conspirator 2 a report that described meeting the objective of an identified Chinese company to acquire U.S. military technology but sought additional funds to complete the "C-17 Special Project."

51.   On August 11, 2011, Unindicted Co-conspirator 1 sent an e-mail to defendant SU that included a screenshot image of a document and asked defendant SU what the document was.

52.   On November 10, 2011, defendant SU drafted and modified a report that discussed how an identified Chinese entity had acquired research and development information that related to a specific military project that was subject to export restrictions and was restricted by the U.S. Department of Defense, explained why that information was valuable, and sought support to complete its work in acquiring more information.

53.   On November 10, 2011, defendant SU sent an e-mail to Unindicted Co-conspirator 1 and Unindicted Co-conspirator 2. Attached to that e-mail was the report described in paragraph 52.

54.   On December 8, 2011, Unindicted Co-conspirator 2 sent an e-mail to Unindicted Co-conspirator 1 with a list of e-mail addresses,

1  names, and affiliations or roles in U.S. and other governments as
2  well as how the e-mail addresses were compromised.

3      55.   On February 26, 2012, Unindicted Co-conspirator 1 sent
4  Unindicted Co-conspirator 2 an e-mail attaching a list of thirty-two
5  U.S. military projects and corresponding amounts of data.

6      56.   On March 23, 2012, defendant SU modified a document related
7  to a flight test plan for the F-35 aircraft with different portions
8  written in English and in Chinese that bore notations that it was
9  proprietary information and subject to export restrictions.

10     57.   On May 3, 2012, defendant SU sent an e-mail to Unindicted
11 Co-conspirator 1 with a subject line of "Plan."  Attached to that e-
12 mail was the document described in paragraph 56.

13     58.   On August 6, 2012, Unindicted Co-conspirator 1 drafted and
14 edited a document that described the acquisition of 65 gigabytes of
15 data in 630,000 files and 85,000 file folders that included scans,
16 drawings, and technical details related to the C-17 obtained by
17 gaining access to the Boeing network in January 2010, and noted that
18 the C-17 had been developed at a cost of $3.4 billion in research and
19 development expenses.

20     59.   On August 13, 2012, Unindicted Co-conspirator 1 sent
21 Unindicted Co-conspirator 2 an e-mail with a subject line of "c17."
22 Attached to that e-mail was the document described in paragraph 58.

23     60.   On February 21, 2013, Unindicted Co-conspirator 1 sent an
24 e-mail to Unindicted Co-conspirator 2 that attached a report.  The
25 attached report described how the entity with which they were
26 affiliated in China used servers in multiple countries, transferred
27 data to Hong Kong or Macau, and then carried the data to China by
28 hand.  The report described how the entity focused in the United

States on military technologies, among other topics, and had acquired data related to the F-35 and C-17.

61.   On May 21, 2014, Unindicted Co-conspirator 1 forwarded an e-mail to a co-conspirator attaching a report describing how a company had been targeted, how its network had been infiltrated, how the computer data stored at the company had been downloaded and transmitted to Macau after going through jumps overseas and before being physically delivered, and how future computer intrusions of the company in a second phase were being designed to address security measures that had prevented acquisition of the information they sought.

1                          COUNT ONE

2           [18 U.S.C. §§ 1030(b), (c)(2)(B)(i)-(iii), (c)(3)(A)]

3  A.   OBJECTS OF THE CONSPIRACY

4        62.   Beginning in or about October 2008, and continuing up to

5  and including at least in or about May 2014, in Orange County, within

6  the Central District of California, and elsewhere, including outside

7  the United States, defendant SU BIN, also known as ("aka") "Stephen

8  Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"),

9  Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others

10 known and unknown to the Grand Jury, knowingly combined, conspired,

11 and agreed with each other knowingly and intentionally to commit

12 offenses against the United States, namely:

13        a.    To intentionally access a computer without

14 authorization, and exceed authorized access, and thereby obtain

15 information from a protected computer, as that term is defined at

16 Title 18, United States Code, Section 1030(e)(2), (1) where the

17 offense was committed for purposes of commercial advantage and

18 private financial gain; (2) where the offense was committed in

19 furtherance of a criminal and tortious act in violation of the

20 Constitution and the laws of the United States, specifically,

21 (a) conspiring to export defense articles, in violation of Title 18,

22 United States Code, Section 371, and Title 22, United States Code,

23 Sections 2778(b)(2) and (c), and Title 22, Code of Federal

24 Regulations, Sections 121.1, 123.1, 127.1(a)(1), 127.1(a)(3),

25 127.1(a)(4), 127.1(d), and 127.1(e), as alleged in Count Four of this

26 Indictment; and (b) conspiring to commit theft of trade secrets, in

27 violation of Title 18, United States Code, Section 1832(a)(5), as

28 alleged in Count Five of this Indictment; and (3) where the value of

1  the information obtained and sought exceeded $5,000, all in violation

2  of Title 18, United States Code, Sections 1030(a)(2)(C) and

3  (c)(2)(B)(i)-(iii); and

4         b.   To knowingly, and with intent to defraud, access a

5  protected computer, as that term is defined at Title 18, United

6  States Code, Section 1030(e)(2), without authorization, and exceed

7  authorized access, and by means of such conduct further the intended

8  fraud and obtain a thing of value, specifically, information related

9  to military and aviation technology, in violation of Title 18, United

10 States Code, Sections 1030(a)(4) and (c)(3)(A).

11 B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

12      ACCOMPLISHED

13      63.   The objects of the conspiracy were to be accomplished in

14 substance as follows:

15      64.   Defendant SU would e-mail Unindicted Co-Conspirators 1 and

16 2 with guidance on what persons, companies, and technologies to

17 target for unlawful computer intrusions.

18      65.   Unindicted Co-Conspirator 1 would e-mail defendant SU

19 information and files showing defendant SU the information and files

20 to which Unindicted Co-conspirator 1 had gained access through

21 unlawful computer intrusions.  Defendant SU would then provide

22 direction to Unindicted Co-conspirator 1 as to which information and

23 files Unindicted Co-conspirator 1 should steal and obtain via

24 unlawful computer intrusions.  After gaining unauthorized access into

25 various protected computers, Unindicted Co-conspirator 1 would then

26 steal, copy, download, transmit, possess, and send the information

27 and files that defendant SU had directed him to obtain.

28

1    66.   Defendant SU, Unindicted Co-conspirator 1, and Unindicted

2   Co-conspirator 2 would then write, revise, and circulate reports that

3   described the information they and others had obtained by engaging in

4   such computer hacking, the value of that information, the

5   significance of the information in developing similar technologies,

6   their progress, and their need to continue their computer intrusions.

7    67.   Defendant SU and Unindicted Co-conspirator 1 would

8   communicate about selling some of the information that they had

9   obtained as a result of their unlawful computer intrusions.

10  C.   OVERT ACTS

11    68.   On or about the relevant dates listed herein, in

12  furtherance of the conspiracy and to accomplish the objects of the

13  conspiracy, defendant SU, Unindicted Co-conspirator 1, Unindicted Co-

14  conspirator 2, and others known and unknown to the Grand Jury,

15  committed various overt acts within the Central District of

16  California and elsewhere.   These overt acts included sending e-mails,

17  drafting and revising reports and other documents, and other overt

18  acts, including but not limited to the allegations contained in

19  paragraphs 19 through 61 of the Introductory Allegations, which are

20  incorporated herein by reference.

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. §§ 1030(a)(2)(C), (b), (c)(2)(B)(i)-(iii);

18 U.S.C. § 2(a)]

Between on or about January 1, 2010 and on or about April 30, 2010, in Orange County, within the Central District of California, and elsewhere, including outside the United States, defendant SU BIN, also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU") intentionally accessed and attempted to access a computer without authorization, and exceeded authorized access, and aided and abetted Unindicted Co-conspirator 1 and other persons known and unknown to the Grand Jury in doing so, and thereby obtained information and attempted to obtain information, including information related to the C-17, from a protected computer, as that term is defined at Title 18, United States Code, Section 1030(e)(2).

The offense was committed by defendant SU (1) for purposes of commercial advantage and private financial gain; (2) in furtherance of a criminal and tortious act in violation of the Constitution and the laws of the United States, specifically, (a) conspiring to export defense articles, in violation of Title 18, United States Code, Section 371, and Title 22, United States Code, Sections 2778(b)(2) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1(a)(1), 127.1(a)(3), 127.1(a)(4), 127.1(d), and 127.1(e), as alleged in Count Four of this Indictment; and (b) conspiring to commit theft of trade secrets, in violation of Title 18, United States Code, Section 1832(a)(5), as alleged in Count Five of this Indictment; and (3) the value of the information obtained and that defendant SU attempted to obtain exceeded $5,000.

COUNT THREE

[18 U.S.C. §§ 1030(a)(4), (b), (c)(3)(A); 18 U.S.C. § 2(a)]

Between on or about January 1, 2010 and on or about April 30, 2010, in Orange County, within the Central District of California, and elsewhere, including outside the United States, defendant SU BIN, also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU") knowingly and with intent to defraud accessed and attempted to access a protected computer, as that term is defined at Title 18, United States Code, Section 1030(e)(2), without authorization, and exceeded authorized access, and aided and abetted Unindicted Co-conspirator 1 and other persons known and unknown to the Grand Jury in doing so, and by means of such conduct furthered defendant SU's intended fraud and obtained a thing of value, including specifically information related to military and other technology and including specifically information related to the C-17.

COUNT FOUR

[18 U.S.C. § 371]

A.   OBJECT OF THE CONSPIRACY

69.   Beginning in or about October 2008, and continuing up to and including at least in or about May 2014, in Orange County, within the Central District of California, and elsewhere, including outside the United States, defendant SU BIN, also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"), Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed with each other knowingly and intentionally to commit an offense against the United States, namely:

a.   To willfully export and cause to be exported from the United States items designated as defense articles on the USML, namely technical data, including by means of disclosing such technical data to foreign nationals, without having first obtained from the DDTC the required export license or authorization for such export, in violation of Title 22, United States Code, Sections 2778(b) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1(a)(1), 127.1(a)(3), 127.1(a)(4), 127.1(d), and 127.1(e).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

70.   The object of the conspiracy was to be accomplished in substance as follows:

71.   Defendant SU would e-mail Unindicted Co-Conspirators 1 and 2 with guidance on what persons, companies, and technologies to

1   target in order to obtain export-controlled technical data and other

2   information through unlawful computer intrusions.

3       72.   Unindicted Co-Conspirator 1 would e-mail defendant SU

4   information and files showing defendant SU the export-controlled

5   technical data and other information and files to which Unindicted

6   Co-conspirator 1 had gained access through unlawful computer

7   intrusions.  Defendant SU would then provide direction to Unindicted

8   Co-conspirator 1 as to which information and files Unindicted Co-

9   conspirator 1 should steal and obtain via unlawful computer

10  intrusions.  After gaining unauthorized access into various protected

11  computers, Unindicted Co-conspirator 1 would then steal, copy,

12  download, transmit, possess, and send the information and files that

13  defendant SU had directed him to obtain, without having obtained

14  permission or authorization to export technical data out of the

15  United States or to disclose it to foreign persons.

16      73.   Defendant SU, Unindicted Co-conspirator 1, and Unindicted

17  Co-conspirator 2 would then write, revise, and circulate reports that

18  described the export-controlled technical data and other information

19  they and others had obtained by engaging in such computer hacking,

20  the value of that information, the significance of the information in

21  developing similar technologies, their progress, and their need to

22  continue their computer intrusions.  The reports would also explain

23  that the information was protected by U.S. export restrictions.

24  C.   OVERT ACTS

25      74.   On or about the relevant dates listed herein, in

26  furtherance of the conspiracy and to accomplish the object of the

27  conspiracy, defendant SU, Unindicted Co-conspirator 1, Unindicted Co-

28  conspirator 2, and others known and unknown to the Grand Jury,

committed various overt acts within the Central District of
California and elsewhere.   Those overt acts included sending e-mails,
drafting and revising reports and other documents, and other overt
acts, and include, but are not limited to, the allegations contained
in paragraphs 30, 40, 42, 43, 44, 50, 52, 53, 56, 57, and 60 of the
Introductory Allegations, which are incorporated herein by reference.

COUNT FIVE

[22 U.S.C. §§ 2778(b)(2), (c);

22 C.F.R. §§ 121.1, 123.1, 127.1(a)(1), 127.1(a)(3), 127.1(a)(4),

127.1(d), 127.1(e); 18 U.S.C. § 2(a)]

Between on or about January 1, 2010 and on or about April 30, 2010, in Orange County, within the Central District of California, and elsewhere, including outside the United States, defendant SU BIN, also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"), Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others known and unknown to the Grand Jury, knowingly and willfully exported, and attempted to export, and aided and abetted Unindicted Co-conspirator 1 and other persons known and unknown to the Grand Jury in exporting defense articles and technical data related to the C-17 from the United States without first having obtained from the DDTC a license or authorization to do so. Defendant SU did so by sending the defense articles and technical data from the United States in any manner, including by transmitting them via the Internet and by disclosing their contents to a foreign person, including himself, defendant SU.

1          COUNT SIX

2          [18 U.S.C. § 1832(a)(5)]

3    A.    OBJECTS OF THE CONSPIRACY

4          75.  Beginning in or about October 2008, and continuing up to

5    and including at least in or about May 2014, in Orange County, within

6    the Central District of California, and elsewhere, including outside

7    the United States, defendant SU BIN, also known as ("aka") "Stephen

8    Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"),

9    Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others

10   known and unknown to the Grand Jury, knowingly combined, conspired,

11   and agreed with each other knowingly and intentionally to commit

12   offenses against the United States, namely:

13          a.   To knowingly steal and without authorization

14   appropriate, take, and conceal, and by fraud, artifice, and deception

15   obtain a trade secret that is related to and included in a product

16   that is produced for, used in, and placed in and intended for use in

17   interstate and foreign commerce, with the intent to convert the trade

18   secret to the economic benefit of someone other than the owner of the

19   trade secret, and intending and knowing that doing so would injure

20   any owner of that trade secret, in violation of Title 18, United

21   States Code, Section 1832(a)(1);

22          b.   To knowingly and without authorization copy,

23   duplicate, photograph, download, upload, replicate, transmit,

24   deliver, send, communicate, and convey a trade secret that is related

25   to and included in a product that is produced for, used in, and

26   placed in and intended for use in interstate and foreign commerce,

27   with the intent to convert the trade secret to the economic benefit

28   of someone other than the owner of the trade secret, and intending

23

1  and knowing that doing so would injure any owner of that trade

2  secret, in violation of Title 18, United States Code, Section

3  1832(a)(2); and

4         c.   To knowingly receive, buy, and possess a trade secret

5  that is related to and included in a product that is produced for,

6  used in, and placed in and intended for use in interstate and foreign

7  commerce, knowing the same to have been stolen and appropriated,

8  obtained, and converted without authorization, with the intent to

9  convert the trade secret, to the economic benefit of someone other

10 than the owner of the trade secret, and intending and knowing that

11 doing so would injure any owner of that trade secret, in violation of

12 Title 18, United States Code, Section 1832(a)(3).

13 B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

14      ACCOMPLISHED

15      76.   The objects of the conspiracy were to be accomplished in

16 substance as follows:

17      77.   Defendant SU would e-mail Unindicted Co-Conspirators 1 and

18 2 with guidance on what persons, companies, and technologies to

19 target for unlawful computer intrusions in order to obtain trade

20 secrets and other information, intending to convert such trade

21 secrets and other information to the economic benefit of persons and

22 entities other than their owners and intending and knowing that doing

23 so would injure the owners of the trade secrets and other

24 information.

25      78.   Unindicted Co-Conspirator 1 would e-mail defendant SU

26 information and files showing defendant SU the trade secrets and

27 other information and files to which Unindicted Co-conspirator 1 had

28 gained access through unlawful computer intrusions.  Defendant SU

1  would then provide direction to Unindicted Co-conspirator 1 as to

2  which information and files, including which trade secrets,

3  Unindicted Co-conspirator 1 should steal and obtain via unlawful

4  computer intrusions.  After gaining unauthorized access to various

5  protected computers, Unindicted Co-conspirator 1 would then steal,

6  copy, download, transmit, possess, and send the information and

7  files, including the trade secrets, that defendant SU had directed

8  him to obtain.  Defendant SU would then receive and possess the

9  information and files, including the unlawfully obtained trade

10 secrets, knowing they had been stolen and obtained without

11 authorization.

12     79.  Defendant SU, Unindicted Co-conspirator 1, and Unindicted

13 Co-conspirator 2 would then write, revise, and circulate reports that

14 described the trade secrets and other information they and others had

15 obtained by engaging in such computer hacking, the value of that

16 information, the significance of the information in developing

17 similar technologies, their progress, and their need to continue

18 their computer intrusions.

19     80.  Defendant SU and Unindicted Co-conspirator 1 would

20 communicate about selling some of the trade secrets and other

21 information that they had obtained as a result of their unlawful

22 computer intrusions.

23 C.  OVERT ACTS

24     81.  On or about the relevant dates listed herein, in

25 furtherance of the conspiracy and to accomplish the object of the

26 conspiracy, defendant SU, Unindicted Co-conspirator 1, Unindicted Co-

27 conspirator 2, and others known and unknown to the Grand Jury,

28 committed various overt acts within the Central District of

California and elsewhere.  Those overt acts included sending e-mails, drafting and revising reports and other documents, and other overt acts, and include, but are not limited to, the allegations contained in paragraphs 20, 34, 43, 44, 45, 46, 47, 49, 52, 53, 56, 57, 58, and 59 of the Introductory Allegations, which are incorporated herein by reference.

A TRUE BILL

_/S/_____
Foreperson

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Section

ANTHONY J. LEWIS
Assistant United States Attorney
National Security Section

AARON LEWIS
Assistant United States Attorney
National Security Section